IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| LORA WORKMAN, | CASE NO. 3:20-CV-01821-JJH |
| Plaintiff, | JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Lora Workman filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 18, 2021, this matter was referred to a magistrate judge for preparation of a report and recommendation pursuant to Local Rule 72.2, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 20, 2021). Following review, and for the reasons stated below, I recommend that the Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Workman protectively filed for DIB on November 2, 2015, alleging a disability onset date of September 1, 2015. (Tr. 149). Her claims were denied initially and on reconsideration. (Tr.

157, 167). She then requested a hearing before an administrative law judge. (Tr. 183-84). Ms. Workman (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 9, 2018. (Tr. 54-148).

At the hearing, the ALJ indicated she wished to seek additional information from a medical expert. (Tr. 147). The ALJ then submitted interrogatories to medical expert, Tonya Fuller, M.D., in August 2018. (Tr. 855). On September 2018, the ALJ informed Ms. Workman's counsel of the right to submit written comments or questions for Dr. Fuller, as well as the opportunity to request a supplemental hearing on Dr. Fuller's testimony (as within the ALJ's discretion to grant). (Tr. 414). Ms. Workman's counsel requested a supplemental hearing, which the ALJ granted, but did not submit written interrogatories before the hearing. (Tr. 242).

The supplemental hearing was held on April 30, 2019. (Tr. 44-52). By that time, Dr. Fuller was no longer contracted with the Agency and so was not present at the hearing. (Tr. 46-47). Ms. Workman's attorney asked to submit a written response, and the ALJ permitted her to file a brief on the issue. (Tr. 49-51; 423-24).

On June 14, 2019, the ALJ found Ms. Workman not disabled in a written decision. (Tr. 25-36). The Appeals Council denied Ms. Workman's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Workman timely filed this action on August 17, 2020. (ECF #1).

FACTUAL BACKGROUND

I.    ADMINISTRATIVE HEARING

Ms. Workman, represented by counsel, appeared at a hearing before the ALJ on January 9, 2018. (Tr. 54-148). Ms. Workman informed the ALJ that she was awaiting genetic testing and a

potential new diagnosis of a neuromuscular disorder; as a result, the ALJ permitted the record be held open an additional 30 days, post-hearing. (Tr. 57-58). Her attorney described the constellation of symptoms Ms. Workman experiences: near-constant migraine headaches, fibromyalgia, nerve pain, right-sided weakness, and stuttering. (Tr. 59-60). The ALJ acknowledged the potential new diagnosis, but requested mental health records in case there was a psychogenic component to Ms. Workman's symptoms. (Tr. 60-61).

Ms. Workman then testified. Ms. Workman testified to having completed some college (the prerequisites for nursing) but had not obtained a degree. (Tr. 65). She worked at Walmart in high school as a cashier and stocking shelves, at home healthcare facilities, and in other temporary positions. (Tr. 68-71). Prior employment included Family Video and Schipper Food Brokerage. (Tr. 68). She was taken out of work in 2015 and had been on short-term and long-term disability, paid through payroll and through her insurance company. (Tr. 65-66). Ms. Workman attempted to work, but her workplace was unable to accommodate her restrictions: frequent bathroom breaks (to vomit), removal of lights from above her desk, and extra time to complete tasks on her computer. (Tr. 66-67). She had worked at Frontier as a call center representative for nearly eleven years. (Tr. 68, 71). She was required to answer calls, and respond via a script, follow the "flow" directed by a computer program, and sell certain products. (Tr. 71). Efficient work was having six to eight programs running at once, each call six to eight minutes long, for a total of forty to sixty calls per day. (*Id.*).

Ms. Workman had "always" suffered from migraines, but in September 2015, she had an episode at work that appeared to be a stroke and she was sent home. (Tr. 72). After that, her migraine symptoms worsened; during these episodes, she would have blurred vision or could not

move her legs. (*Id.*). With her husband's assistance, she was sometimes able to walk, but not always. (Tr. 72-73). She loses the ability to move her legs "often." (*Id.*).

In addition to leg issues, Ms. Workman testified to an inability to walk due to dizziness and right-sided numbness. (Tr. 74-75). She has to concentrate very hard to complete tasks, including swallowing food, handwriting, coming up with words, and climbing stairs. (Tr. 75-76). It's as if her mind is trying to get her legs to work, but "they're not working." (Tr. 76). She testified to experiencing stabbing and burning pain from her hips down to her feet. (Tr. 77). According to Ms. Workman, her doctors believe these issues could stem from fibromyalgia or from cervical cranial syndrome—described as "overactive nerves." (*Id.*). Ms. Workman testified to an inability to concentrate due to pain and an over-sensory condition with her nerves. (Tr. 79).

Ms. Workman has four children, ages ten, eight, six, and four at the time of the hearing. (Tr. 80-81). She homeschools her children. (Tr. 81). The oldest children help Ms. Workman with household chores. (*Id.*). Ms. Workman can still do laundry and cook simple meals with help from her children. (Tr. 80-81). Ms. Workman's husband works third shift so he can be home during the day; if Ms. Workman is having a bad day, he will assist the children with their homeschooling. (Tr. 81).

Ms. Workman testified to taking a number of medications, vitamins, and supplements to treat her migraines and nerve pain issues. (Tr. 83-84). She has also tried Botox treatments, physical therapy, and water therapy. (*Id.*). She was on Lyrica at the time of the hearing, and testified that it helped with the pain and to sleep at night. (Tr. 83-85). Ms. Workman testified to having more minor headaches—not the migraines that worsened in September 2015—nearly every day. (Tr. 87-88). She was able to treat these headaches with over-the-counter medications such as Excedrin,

4

Tylenol, or ibuprofen. (Tr. 88). She only takes those medications when she is not taking Zanaflex or indomethacin (NSAIDs), which she uses to prevent severe migraines from starting. (Tr. 88-90). Ms. Workman testified she is not always able to "catch" the migraines before they start, and she will have multi-day migraine episodes. (Tr. 91-92).

Ms. Workman also provided an extensive description of the various symptoms she was experiencing, including dizziness, numbness, nausea, diarrhea, pain, stuttering, sensitivity to scent, light, and noise. (Tr. 92-118). Ms. Workman testified experiencing these symptoms since 2015, and they had significantly worsened in the six months prior to the administrative hearing. (Tr. 113-19).

Ms. Workman described the method she uses to homeschool her children. (Tr. 122-28). Although the school-age children were largely self-sufficient, Ms. Workman answered questions and helped them with their worksheets as she was able. (Tr. 124, 127-28). She also ensured the children completed their standardized tests and she filed the intent-to-homeschool notice with the local school district every year. (Tr. 125).

During the relevant period, Ms. Workman testified to interviewing with several companies. (Tr. 128-29). Ms. Workman testified she was forthright during these interviews and described her health problems; she stated these companies would not hire her because she could not guarantee that she would be present during scheduled work hours. (Tr. 129). Ms. Workman no longer commits herself to activities, church, or hobbies, because she is not sure how her body will react or if she will have a migraine that day. (Tr. 129-30). She used to be part of the worship band in her church but can no longer play piano or sing. (Tr. 130). She still attends church because she only is required to sit during the service. (*Id.*).

The VE then testified. (Tr. 131). The VE testified that Ms. Workman's job at the call center was sedentary. (Tr. 132). Ms. Workman was then questioned about the activities of her previous positions to determine the level of exertion required. (Tr. 132-37). After receiving Ms. Workman's testimony, the VE classified Ms. Workman's prior work as:

- Call center: Customer order clerk, SVP (specific vocational preparation) 4, semi-skilled, sedentary; sedentary as performed.

- Home health aide, SVP 3, semi-skilled, medium; heavy as performed.

- Whirlpool: Line assembler for appliances, SVP 3, semi-skilled, medium; medium as performed.

- Family Video: Sales clerk, retail, semi-skilled, light; light as performed.

- Wal-Mart: Merchandise displayer, SVP 6, skilled, medium; medium as performed.

(Tr. 137-38).

The ALJ then posed a hypothetical to the VE. (Tr. 138-39). Assume an individual of Ms. Workman's age, education, and experience, who could perform work in the light exertional range, but no climbing of ladders, ropes, and scaffolds, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; the individual should avoid all hazards of unprotected heights and dangerous machinery, and avoid concentrated exposure to pulmonary irritants, a loud noise environment, but could tolerate moderate noise levels or quieter; the individual should work indoors, but not in bright light. (*Id.*). The VE responded the hypothetical individual could perform jobs at the light level of exertion, *i.e.*, Ms. Workman's past jobs as customer order clerk and sales clerk. (Tr. 139).

The ALJ then posed a second hypothetical, added to the previous hypothetical, in which the ALJ reduced the exertional level to sedentary, and limited right (dominant) hand fingering to

frequent use for gross and fine manipulation, handling, fingering, and feeling. (*Id.*). The VE testified that such individual could still perform work as a customer order clerk. (Tr. 139-40).

The ALJ asked a third hypothetical, again added to the previous hypotheticals. (Tr. 140). In this hypothetical, the individual was limited to learning, understanding, remembering, and carrying out simple work instructions, with occasional changes in the work tasks, and occasional oral communications with others. (Tr. 140). In that instance, the VE testified the individual would be unable to perform past relevant work. (*Id.*). However, according to the VE's testimony, the individual would be able to perform other work in the national economy: document preparer, SVP 2, sedentary; table worker, SVP 2, sedentary; and touch-up screener, SVP 2, sedentary. (Tr. 140-41).

The ALJ added additional limitations to the previous hypotheticals. (Tr. 141). The VE responded that the sedentary jobs listed in the previous example would require frequent, not occasional manipulation of the bilateral hands. (*Id.*). And if the individual in the third hypothetical (frequent manipulation) would arrive late, leave early, or be absent entirely from work at least eight days per month, the individual would not be able to perform any jobs in the national economy. (Tr. 141-42). Similarly, an individual in the third hypothetical unable to concentrate, sustain, or complete with reasonable regularity even simple routine work tasks would not be able to work in the national economy. (Tr. 142). The VE testified that an individual would need to remain on task 85-90% of the day, exclusive of breaks and lunch, regardless of physical or mental difficulty. (*Id.*). In addition, the VE testified that the Dictionary of Occupational Titles did not speak to restrictions regarding fluorescent lighting at workstations, nor did it contemplate flexible schedules or less than full-time work. (Tr. 142-44).

Ms. Workman's attorney then questioned the VE, asking whether an individual who needs up to four additional breaks of five to ten minutes would be able to maintain the sedentary, unskilled jobs identified. (Tr. 145). The VE responded that outside of typical morning, afternoon, and occasional bathroom breaks, no additional unscheduled extra breaks would be tolerated. (Tr. 145). The VE testified that although employers would tolerate flexible bathroom breaks, the individual would not be able to remove themselves from the job site in the middle of a task. (Tr. 145). If the individual needed frequent bathroom breaks, it would be work-preclusive. (Tr. 145-46). In addition, if the person required frequent re-instruction and could not understand or retain information beyond a regular training period, it would not be compatible with competitive work. (Tr. 146). Finally, if the individual's symptoms of pain or paralysis were such that it would disturb others around them, employers would not tolerate such behavior. (*Id.*).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Workman was born in June 1983 and was 32 years old on the alleged onset date of her disability; she was therefore defined as a younger individual age 18-49. (Tr. 149; *see also* 20 C.F.R. § 404.1563). Ms. Workman had past relevant work as a sales clerk and a customer order clerk; this work does not require the performance of activities precluded by her residual functional capacity (RFC). (Tr. 35; *see also* 20 C.F.R. § 404.1565). Ms. Workman also had past relevant work as a home health aide, appliance assembly line worker, and merchandise displayer; however, Ms. Workman could no longer perform such work because the physical demands of these jobs exceeded her RFC. (Tr. 35-36).

III.   RELEVANT MEDICAL EVIDENCE[1]

Mark Piacentini, M.D., is a family physician and treated Ms. Workman for her migraines. (*See* Tr. 439-95, 523-91, 671-80, 789-830). In July 2014, Ms. Workman attended an office visit with Dr. Piacentini and reported having a persistent headache with migraine and nausea for three days. (Tr. 440). He prescribed tramadol and Imitrex. (Tr. 443). She returned to his office the following day complaining of a headache with associated nausea, vomiting, and photophobia. (Tr. 442). Ms. Workman reported being unable to tolerate light and sound. (Tr. 443). Dr. Piacentini gave Ms. Workman an Imitrex injection and, after three hours, released her to go home. (Tr. 443).

In September 2014, Ms. Workman followed up with Dr. Piacentini after being seen in the Emergency Department for a migraine that lasted one week. (Tr. 446). She reported that Tylenol #3, Imitrex, and Benadryl helped ease the migraine for only a short while before it returned. (Tr. 447). In October 2014, Ms. Workman saw Dr. Piacentini twice for headaches and vomiting. (Tr. 448, 451). Dr. Piacentini prescribed nortriptyline. Ms. Workman stopped taking nortriptyline in November due to side effects and received Trileptal. (Tr. 454).

In February 2015, Ms. Workman saw Dr. Piacentini and complained of headache, sinusitis, and vomiting with diarrhea for three days. (Tr. 457). Dr. Piacentini noted Ms. Workman was unable to tolerate Topamax, nortriptyline, or beta-blockers due to side effects. (Tr. 458). She received prescriptions for Augmentin, Flonase, and Zofran. (Tr. 458). In March 2015, Ms.

---

[1]   The Commissioner's brief indicates that evidence prior to 2015 is not relevant. (Def.'s Br., ECF #17, PageID 1098, "[Ms. Workman's] record begins in February 2015 when she visited Dr. Mark Piacentini . . ."). Ms. Workman seeks benefits due to chronic conditions that have developed and worsened over time. Medical records prior to the alleged onset date are relevant to creating a longitudinal picture of Ms. Workman's conditions and are therefore included in this summary of relevant medical evidence. *See* SSR 18-1.

Workman reported her headaches were not as bad, and she was able to stop two headaches before they became migraines. She also related that Norco hurts her stomach. (Tr. 460).

On April 29, 2015, Ms. Workman saw Abdelhakim Hussein, M.D., on referral from Dr. Piacentini. (Tr. 433). She reported her lifelong experience with migraines with associated photo- and phonophobia, sensitivity to smell, dystharia causing stuttering, dizziness, and double vision. (Tr. 433). Ms. Workman described her headaches as moderate to severe in intensity, beginning in the occipital area and radiating to her forehead. (Tr. 433). Dr. Hussein noted her poor tolerance to prevention medications and ordered her to continue using injectable Imitrex in addition to propranolol and Fiorcet. (Tr. 434). Ms. Workman returned to Dr. Hussein's office in May 2015. She reported that propranolol helped reduce migraine and headache intensity but Fiorcet was not effective. (Tr. 431). Dr. Hussein ordered Ms. Workman to continue taking Imitrex and propranolol but to discontinue Fiorcet. (Tr. 432). Ms. Workman returned again on August 4, 2015. (Tr. 429). Dr. Hussein continued her current medications and asked her to reduce her use of Tylenol #3 tablets to avoid rebound and addiction. (Tr. 430).

At a follow-up office visit with Dr. Piacentini in August 2015, Ms. Workman complained of migraines associated with dizziness, numbness and tingling in her feet and face, facial droop, intense head pain, and hypersensitivity to the right side of her jaw. (Tr. 469-70). In September 2015, a CT brain scan revealed a stable cyst in the fourth ventricle, likely benign. (Tr. 484). Ms. Workman's EEG test came back normal. (Tr. 486). On September 11, 2015, Dr. Piacentini noted left-sided neurological deficits on exam. (Tr. 473). Ms. Workman complained of stuttering, facial droop, temporary blindness in one eye, and an unsteady gait. (Tr. 473). Dr. Piacentini noted her dizziness and slurred speech were severe. (Tr. 473). Ms. Workman returned to Dr. Piacentini's

office on October 23, 2015 and complained of having three major migraine episodes since her previous visit. (Tr. 475). Dr. Piacentini noted Ms. Workman's speech was stuttered and uneven. (Tr. 476).

On November 9, 2015, Ms. Workman returned to Dr. Hussein's office. (Tr. 426). She complained of severe migraines that interfered with her ability to walk and more stuttering of variable severity. (Tr. 426). She reported propranolol was partially effective at reducing the severity of non-migraine headaches but that she still endured six to seven headaches a week and two migraines in the last month, lasting two to three days each. (Tr. 427). She returned to Dr. Piacentini's office on November 23, 2015. (Tr. 478). She reported enduring stuttering and an eyelid droop before a bad headache. (Tr. 479).

In December 2015, Ms. Workman saw neurologist Christopher Vincent, D.O. (Tr. 500). Ms. Workman described her migraine history and identified possible triggers, including lack of food and sleep, loud noises, strong smells, and weather changes. (Tr. 500). On physical examination, Dr. Vincent noted decreased right symmetric sensation at cranial nerves I-III with decreased sensation to vibration across the midline. (Tr. 501). Dr. Vincent also found paravertebral hypertonicity in Ms. Workman's cervical spine, left greater than right. (Tr. 501). Dr. Vincent continued her prescription for propranolol, cyclobenzaprine, and promethazine, and added duloxetine, and recommended her for a course of physical therapy to address the tension component of her headaches. (Tr. 502).

Ms. Workman returned to Dr. Vincent's office in January 2016 and noted the combination of diclofenac and cyclobenzaprine takes the edge off her headaches and, when taken with sumatriptan, helps with the more severe headaches. (Tr. 515). In March, she returned and

reported she was still having headaches and not seeing as much improvement with the medications. (Tr. 517). She also reported worse headaches occurring after more intense physical therapy sessions. (Tr. 518).

On March 24, 2016, Ms. Workman returned to Dr. Piacentini while enduring a headache. The doctor noted her ill appearance and that she looked as though she would pass out during the neurological examination. (Tr. 543-44). That day, Ms. Workman went to the Emergency Department for the headache and complained of associated nausea, vomiting, and sensitivity to light and sound. Ms. Workman appeared distressed and was tachycardic. Ms. Workman had significant improvement after receiving Toradol, Benadryl, and Reglan. (Tr. 691-693).

In April 2016, Ms. Workman complained to Drs. Piacentini and Vincent about how the medications were not as helpful. She reported experiencing hallucinations and visual disturbances with headaches, stuttering, decreased appetite, poor sleep, chills, constipation, diarrhea, fatigue, and anxiety. (Tr. 547-48). The doctor prescribed Augmentin. (Tr. 548). The hallucinations stopped when Ms. Workman ceased taking vitamin $B_{12}$. (Tr. 551). In May 2016, Ms. Workman complained of tingling and numbness in her right arm. (Tr. 550). On June 7, 2016, Ms. Workman reported headaches associated with shortness of breath, vomiting, numbness, migraines, and tingling from her hips and down. (Tr. 552-53).

In July 2016, Ms. Workman saw Madhu Mehta, M.D., a rheumatologist, who identified the presence of multiple tender points and thought Ms. Workman had fibromyalgia. (Tr. 593-600). He prescribed gabapentin and vitamin D. (Tr. 557). On July 29, 2016, Ms. Workman saw Dr. Vincent and reported having some good days. (Tr. 642). She also noted her headaches worsened in

the afternoon. Ms. Workman's medications help with her symptoms, but they upset her stomach or make her tired. (Tr. 644).

Ms. Workman returned to Dr. Mehta's office on September 25, 2016, where she reported diffuse body pain, fatigue, headaches, and increased leg pain. Dr. Mehta again noted the presence of multiple tender points consistent with fibromyalgia. (Tr. 601-604). On September 27 and December 29, 2016, Ms. Workman received Botox injections from Kevin Weber, M.D., for her headaches without relief. (Tr. 654, 655). On January 12, 2017, Ms. Workman reported that gabapentin was somewhat effective for her aches and pains. (Tr. 604). Again, Dr. Mehta noted the presence of multiple tender points. (Tr. 608).

Ms. Workman attended a physical therapy evaluation on January 19, 2017 where she related headaches and neck pain associated with stuttering, tremor, and poor cognition. (Tr. 658-61). After a total of 4 visit, she was discharged from therapy on July 18, 2017 because it was ineffective. (Tr. 728).

On February 9, 2017, Ms. Workman went to the Emergency Department again for a headache associated with nausea and vomiting. (Tr. 681-86). She described the pain as frontal, diffuse, constant, and throbbing, exacerbated by light, sound, and movement. (Tr. 682). Her symptoms improved with Toradol, Benadryl, and Reglan. (Tr. 684).

On February 28, 2017, Ms. Workman saw Kathleen Moore, a certified Nurse Practitioner, in Dr. Weber's office. (Tr. 719). She was tearful during the visit. (Tr. 722). Nurse Moore noted occipital neuralgia, greater on the right side, and paracervical and upper shoulder musculature/traps tenderness and hypertonicity. (Tr. 722). Ms. Workman received a greater occipital nerve block that day. (Tr. 725). She returned to Nurse Moore on May 22, 2017, denying

13

benefit from the greater occipital nerve block and noted more pain in her legs and a pins and
needles sensation on the bottoms of her feet at night. (Tr. 731). Ms. Workman also reported
intermittent numbness and tingling in her arms, causing her to drop items more often. (Tr. 731).
Nurse Moore noted paracervical and upper shoulder musculature/traps tenderness and
hypertonicity. (Tr. 732).

On June 15, 2016, Ms. Workman returned to Dr. Piacentini's office complaining of
headaches, templar pain, and migraines. (Tr. 791). The doctor noted Ms. Workman appeared ill,
tired, and listless. (Tr. 792).

On June 23, 2017, Ms. Workman underwent an EMG, which came back normal. (Tr. 757-
58). Before the procedure, the physician performed a limited examination and noted left eyelid
droop, hypertrophy of thighs and gastrocnemius muscles, normal strength, and normal reflexes.
(Tr. 757). Ms. Workman also underwent short and long exercise testing, which revealed no
evidence of channelopathy. (Tr. 847-48).

Ms. Workman returned to Nurse Moore on August 21, 2017. (Tr. 733). On physical
examination, Nurse Moore noted severe occipital tenderness bilaterally, and paracervical and
upper shoulder musculature/trap tenderness and hypertonicity. (Tr. 737). She displayed
diminished right upper extremity strength and myokymia (eyelid twitching) upon extraocular
movement testing that persisted for about one minute following the eye test. (Tr. 737).

Ms. Workman saw Dr. Weber on August 25, 2017. (Tr. 738). On examination, Dr. Weber
noted mild right-sided hemiparesis and confirmed "odd myokymia like movements on EOM." (Tr.
738). Dr. Weber also found reduced right upper extremity strength and reduced sensation on the
right side of her body. (Tr. 740).

In September 2017, Ms. Workman underwent MRIs on her brain and cervical spine, both revealing normal studies. (Tr. 746-48).

On October 6, 2017, Ms. Workman saw Mark Constable, also a certified Nurse Practitioner. (Tr. 751). Nurse Constable noted myokymia on EOM testing and hyperesthesia on the right side of Ms. Workman's shoulder, back, neck, and face. (Tr. 754). While testing Ms. Workman's reflexes, Nurse Constable noted facial spasms, a rolling motion in her right shoulder, and rotation of her right forearm. (Tr. 755). Once the twitches ceased, Nurse Constable noted right-sided facial droop and eye ptosis. (Tr. 755).

On October 19, 2017, Ms. Workman attended an appointment with Samantha Lorusso, M.D., a neurologist. On examination, Dr. Lorusso noted excessive blinking and twitching of the eyes and face, light touch and pinprick sensation decreased on the right side, a narrow-based gait, and intact tandem walking with some astasia abasia.[2] (Tr. 839-40). Dr. Lorusso ordered labs to test for myasthenic syndrome. (Tr. 840).

On October 26, 2017, Ms. Workman returned to Dr. Piacentini and reported that she stopped taking gabapentin because it made her too tired during the day. (Tr. 794). On November 3, 2017, Ms. Workman saw Nurse Moore. She related that her daily headaches had improved but the migraines were much more severe. (Tr. 795). Examination revealed myokymia and right-sided weakness. (Tr. 800). Ms. Workman saw Nurse Moore again on February 6, 2018. She continued to complain of migraines with light, sound, and smell sensitivity, nausea, vomiting, and vertigo. (Tr.

---

[2]     "The inability to stand or walk in a normal manner; the gait is bizarre and is not suggestive of a specific organic lesion; often the patient sways wildly and nearly falls, but recovers at the last moment; a symptom of hysteria-conversion reaction." *Astasia-abasia*, Stedman's Medical Dictionary 80290 (Nov. 2014).

901). She reported more tingling in her hands and feet, near daily headaches, and two to three migraines lasting several days each. (Tr. 901).

On February 22, 2018, Ms. Workman reported to Dr. Piacentini that her new medications (CoQ10, vitamin D, and amitriptyline) seemed to help her migraines. (Tr. 883-884).

On July 16, 2018, Ms. Workman saw Kiran Rajneesh, M.B.B.S,[3] an interventional pain specialist. (Tr. 929). She complained of non-radiating neck pain and exhibited pain to palpation of the cervical paraspinous muscles and pain with flexion, extension, and lateral flexion. (Tr. 931). She displayed positive facet loading but her cervical spine x-ray was normal. (Tr. 931-32).

On November 5, 2018, Ms. Workman saw Dr. Lorusso. Again, Dr. Lorusso noted excessive blinking and twitching of her eyes and face, decreased sensation to light touch, and a narrow-based gait with some astasia abasia. (Tr. 923). Dr. Lorusso prescribed Mestinon (pyridostigmine), a medication used to improve muscle strength in patients with myasthenia gravis.[4] Ms. Workman experienced throat tightening and diarrhea with this medication. (Tr. 925).

**Dr. Fuller.** After the administrative hearing, the ALJ submitted interrogatories to medical expert Tonya Fuller, M.D., a board-certified neurologist. (Tr. 867-78). In her response, Dr. Fuller described Ms. Workman's history of brain and cervical spine cysts, and the migraine headaches Ms. Workman experienced. (Tr. 874). Dr. Fuller considered Ms. Workman's complaints under adult neurological listings 11.05 (benign brain tumors) and 11.08 (spinal cord disorders) and

---

[3]     Bachelor of Medicine, Bachelor of Surgery – "an international medical degree equivalent to and M.D. in this us." MayoClinic, *Medical Credentials and Degrees Explained*, https://www.mayoclinic.org/healthy-lifestyle/consumer-health/in-depth/medical-credentials/art-20454969 (last visited November 15, 2021).

[4]     WebMD, *Drugs and Medications: Mestinon*, https://www.webmd.com/drugs/2/drug-93076/mestinon-timespan-oral/details (last visited November 15, 2021).

found Ms. Workman did not meet the criteria required by these listings. (Tr. 875). Across the

board, Dr. Fuller found Ms. Workman had no postural limitations as a result of her impairments,

but would require a quiet work environment. (Tr. 868-73).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since September 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: migraine; fibromyalgia; and cervicocranial syndrome (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing ladders, ropes, or scaffolds; occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling; avoid exposure to loud noises in the work environment but able to tolerate moderate noise level or quieter; and work indoors with no exposure to bright light.

6. The claimant is capable of performing past relevant work as a sales clerk and customer order clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2015, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 28-36).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Workman raises two issues: first, the ALJ's RFC determination is not supported by substantial evidence, and second, the ALJ erred in her handling of Ms. Workman's request for a supplemental hearing. (Pl.'s Br., ECF #13, PageID 1080, 1085). I will discuss both arguments in turn.

I.     **The ALJ's RFC determination was supported by substantial evidence.**

Ms. Workman claims the ALJ's RFC determination was not supported by substantial evidence; namely that the ALJ erred by relying on her own lay opinion when forming the RFC, and that the medical evidence instead shows Ms. Workman could not perform sustained work activities. (Pl.'s Br., ECF #13, PageID 1081-85). The Commissioner counters that substantial evidence supports the RFC, and the ALJ properly considered Ms. Workman's subjective symptoms. (Def.'s Br., ECF #17, PageID 1112).

A.     **The ALJ appropriately considered the medical opinion evidence.**

Ms. Workman argues it is unclear how the ALJ determined what limitations were supported by the evidence because the ALJ only gave partial weight to the only medical opinions of record, and substituted her own opinion for those of Dr. Fuller and the state agency medical consultants. (Pl.'s Br., ECF #13, PageID 1082). Ms. Workman, noting consistent documentation of her reported symptoms, asserts the evidence supports a more restrictive residual functional capacity. (*Id.* at PageID 1083).

Residual functional capacity is the most an individual can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ is responsible for assessing an individual's residual functional capacity. 20 C.F.R. § 404.1546(c). An individual's residual functional capacity assessment is based on all the relevant medical evidence and other relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(3). "The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined [residual functional capacity] based on objective medical evidence and non-medical evidence." *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-CV-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149,

156-57 (6th Cir. 2009) (affirming ALJ's denial of disability after rejecting a treating source's opinion and also not basing the opinion on any other medical source opinion).

In crafting Ms. Workman's residual functional capacity, the ALJ's decision thoroughly discussed the medical records and other evidence, including Ms. Workman's reports of near daily headaches, increasingly more frequent and severe migraines, and weakness and dysfunction on the right side of her body. (Tr. 29-35). The ALJ's decision also considered the generally benign neurological and diagnostic findings, including the MRIs, EEG, and EMG, and the mild sensory and strength deficits in Ms. Workman's right arm. (*Id.*). The ALJ considered the frequency with which Ms. Workman changed medical providers, her inconsistent compliance with the suggested treatment regimens due, in part, to medication side effects, and Ms. Workman's role in homeschooling three children and caring for a toddler without any particular assistance. (*Id.*).

The ALJ addressed the state agency medical consultants' opinions. She noted the consultants determined Ms. Workman could engage in medium exertion work. (Tr. 34). The ALJ assigned only partial weight to the consultant's opinions because "they were not based on the complete record and do not consider [Ms. Workman's] testimony." (Tr. 35).

The ALJ afforded little weight to Dr. Fuller's opinion because, as Ms. Workman noted in her written response to Dr. Fuller's interrogatories, Dr. Fuller did not consider the impact of fibromyalgia or cervicocranial syndrome on Ms. Workman's functional ability. (Tr. 35). The ALJ did, however, afford weight to Dr. Fuller's ultimate conclusion that Ms. Workman's headaches and migraines were not as debilitating as alleged. (Tr. 35). In her summation, the ALJ concluded the residual functional capacity assessment "is supported by the objective medical findings, [Ms. Workman's] treatment history and specifically her history of non-compliance with treatment

recommendations, and [Ms. Workman's] activities of daily living and specifically her homeschooling and childcare activities in the home." (Tr. 35).

The ALJ engaged in a thorough review of the evidence in the record and crafted a well-reasoned residual functional capacity for Ms. Workman. Ms. Workman has not identified any legal error in the ALJ's assessment, nor has she shown the ALJ's decision is not supported by substantial evidence. Accordingly, I find there is substantial evidence to support the ALJ's decision on this issue.

### B. The ALJ's analysis of Ms. Workman's symptoms conforms to SSR 16-3p.

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the Commissioner determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the Commissioner evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id*. At the second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id*.

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific

22

conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints and the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019).

Here, the ALJ determined Ms. Workman's complaints of pain were inconsistent with the objective medical evidence and Ms. Workman's daily activities. The ALJ noted "Despite [Ms. Workman's] assertion of debilitating symptoms, [Ms. Workman] has been homeschooling three children and caring for an older toddler" and doing so without any particular assistance from others. (Tr. 34). While Ms. Workman alleges the ALJ improperly relied on Ms. Workman's role as a homeschool teacher because the schooling was "online and self-directed," the ALJ addressed this in her decision:

> She minimized her role in the homeschooling to just asking her kids to log on but this is questionable since one presumes a child must be able to read and do basic school skills before they could self-test online. There are also requirements and communication necessary for her children to be given school credit. She finally acknowledged it is a lot of work and now they are thinking of returning the children to public school in the future, but she has managed to keep up with these responsibilities consistently since the alleged onset of disability.

(Tr. 34). In addition, the ALJ noted Ms. Workman's admission to interviewing for jobs, "even when she was allegedly suffering from these debilitating symptoms." (*Id.*). The ALJ clearly

articulated how she evaluated Ms. Workman's alleged symptoms as required by SSR 16-3p. Ms.

Workman has not identified a compelling reason to disturb the ALJ's analysis.

## II.   The ALJ's handling of the supplemental hearing did not harm Ms. Workman's due process rights.

Ms. Workman raises error with the ALJ's handling of the supplemental hearing regarding

Dr. Fuller's testimony. Specifically, Ms. Workman argues the ALJ did not comply with procedural

rule I-2-4-44 of the *Hearings, Appeals, and Litigation Law Manual* ("HALLEX")[5] and thereby deprived

Ms. Workman of her due process rights. (Pl.'s Br., ECF #13, PageID 1085-88). The Commissioner

acknowledges that Ms. Workman was not given the opportunity to cross-examine Dr. Fuller, but

then asserts that because Ms. Workman was permitted to respond to Dr. Fuller's opinion by

written brief, she was not denied due process. (Def.'s Br., ECF #17, PageID 1118-19). I agree with

the Commissioner.

The Due Process Clause of the Fifth Amendment establishes that no deprivation of life,

liberty, or property will occur without notice and a fair hearing. *Flatford v. Chater*, 93 F.3d 1296,

1303 (6th Cir. 1996). To prevail on a due process claim, the claimant must establish that the

United States attempts to deprive her of a protected interest. *Id.* at 1303-04. And because social

security claimants have a property interest in benefits for which they hope to qualify, this element

is readily satisfied. *Id.* at 1304.

---

[5]      Ms. Workman cites to HALLEX I-2-4-44, which does not exist; moreover section I-2-4 discusses dismissals. *See* HALLEX Chapter I-2-4, Dismissals. Ms. Workman then provides an uncited quote to HALLEX I-2-5-44, which is titled "Action When Administrative Law Judge Receives Medical Expert's Responses to Interrogatories." I have referred to HALLEX I-2-5-44 in my review of Ms. Workman's case.

Due process also requires social security hearings be "full and fair." *Id.* at 1305, citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971). But "due process does not require the Commissioner to allow a social security claimant upon request to cross-examine every physician providing post-hearing evidence in order for the hearing to be 'full and fair.'" *Id.* Neither is an evidentiary hearing the most effective method of decision-making in all circumstances. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). Rather, due process requires that claimants be given a "meaningful opportunity to present their case." *Id.* at 349. For the reasons that follow, I find that Ms. Workman received a full and fair hearing, was afforded a meaningful opportunity to present her case, and was not deprived of her due process rights.

Ms. Workman argues the ALJ's failure to follow HALLEX procedures resulted in a denial of her due process rights. (Pl.'s Br., ECF #13, PageID 1087). HALLEX is a guidelines manual issued by the Social Security Administration's Office of Disability Adjudication and Review describing the policies ALJ's should follow when conducting hearings and reviewing a claimant's case. It can be helpful guidance for federal courts as well when determining if SSA has failed to follow its own procedural rules. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008). HALLEX rules, however, are not binding on this Court. *Id.* Although HALLEX procedures may embody federal due process rights, the failure to comply with HALLEX does not, in and of itself, deprive a claimant of due process. *Green v. Comm'r of Soc. Sec.*, No. 1:13 CV 2356, 2015 WL 779043, at *9 (N.D. Ohio Feb. 24, 2015).

HALLEX I-2-5-44(A) requires an ALJ to proffer a copy of a medical expert's response to written interrogatories in accordance with the procedure outlined in HALLEX I-2-7-30 ("Proffer Procedures), which permits the claimant to submit a written statement, written questions, request

a supplemental hearing, and the opportunity to request a subpoena for witnesses. The ALJ must also allow the claimant to propose additional interrogatories or request a supplemental hearing to question the medical expert, even if the claimant previously had the opportunity to do so. HALLEX I-2-5-44(B). But a supplemental hearing is not required; due process is satisfied if the claimant is given the opportunity to submit interrogatories. *Chandler v. Comm'r of Soc. Sec.*, 124 F. App'x 355, 359 (6th Cir. 2005). If a supplemental hearing is granted and the medical expert does not appear, it is within the ALJ's discretion to issue a subpoena for the medical expert's appearance, but the ALJ is not required to do so. HALLEX I-2-5-44(B) n.2.

Here, the ALJ followed HALLEX procedures. During the initial hearing in January 2018, the ALJ informed Ms. Workman and her counsel that she was considering obtaining additional evidence from a medical expert. (Tr. 147). The ALJ then retained Dr. Fuller as a medical expert in Ms. Workman's case, submitted written interrogatories, and informed Ms. Workman's counsel of Dr. Fuller's responses. (Tr. 414-15). This letter to Ms. Workman's counsel, in accordance with HALLEX I-2-5-44, indicates Ms. Workman's right to submit a written response or to request a supplemental hearing. (*Id.*). On September 26, 2018, Ms. Workman, through her counsel, requested a supplemental hearing, but did not submit written interrogatories. (Tr. 48, 242).

The supplemental hearing was held on April 30, 2019, at which time the ALJ informed Ms. Workman that Dr. Fuller was no longer contracted by the Agency and was unavailable for the hearing. (Tr. 47-48). After discussion of the best course of action in light of the medical expert's inability to appear, Ms. Workman's counsel requested the ALJ permit her to submit a written response to Dr. Fuller's opinion. (Tr. 49-50). The ALJ permitted Ms. Workman's counsel to submit a written brief by May 7, 2019. (Tr. 50). She did so on May 1, 2019. (Tr. 423-24).

The ALJ followed all procedural requirements prescribed by HALLEX I-2-5-44 and did not deprive Ms. Workman of due process. Ms. Workman was informed that the ALJ retained a medical expert and was provided Dr. Fuller's responses. Although Ms. Workman did not have the opportunity to cross-examine Dr. Fuller in person, she was permitted to submit a written response. Therefore, Ms. Workman had a meaningful opportunity to present her case and I find no reason to recommend remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB supported by substantial evidence and recommend the decision be **AFFIRMED.**

Dated: November 15, 2021

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

***ANY OBJECTIONS*** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).